David R. Seligman, P.C.
Susan D. Golden
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Christopher M. Hayes (*pro hac vice* pending)
Alexander D. McCammon (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| EUROPCAR MOBILITY GROUP S.A.,[1] | Case No. 20-12878 (___) |
| Debtor in a Foreign Proceeding. | |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN**
**MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Luc Péligry (the "Petitioner" or "Foreign Representative"), in his capacity as the authorized representative of the above-captioned debtor (the "Debtor") regarding the Debtor's foreign restructuring proceeding, a *sauvegarde financière accélérée* (i.e., "expedited financial safeguard") (the "French Proceeding") before the *Tribunal de Commerce de Paris* (Commercial Court of Paris) in the French Republic (the "French Court"), respectfully submits this chapter 15 verified petition (together with the official form petition filed concurrently herewith, the "Petition") for recognition of the French Proceeding pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code") as a "foreign main proceeding," or, in the alternative, as a "foreign

---

[1]    Europcar Mobility Group S.A. is the debtor in this chapter 15 case.  Europcar Mobility Group S.A. is a public limited company with registration number 489 099 903.  The location of Europcar Mobility Group S.A.'s registered office is 13 ter Boulevard Berthier, 75017 Paris, France.

nonmain proceeding," and for additional relief pursuant to sections 1520 and 1521 of the Bankruptcy Code.

In support of the Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Péligry Declaration")[2] and (b) the *Declaration of François Kopf in Support of Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Kopf Declaration"), each of which are incorporated herein by reference.

## Preliminary Statement

1.      The Debtor (together with its non-Debtor direct and indirect subsidiaries, the "Europcar Group") has a storied history as an innovator and leader of the mobility services industry.  Headquartered in Paris, France, the Europcar Group has a worldwide presence, serving over 9.5 million customers in over 140 nations, including France, the United Kingdom, Ireland, Australia, and the United States.  The Europcar Group offers attractive alternatives to vehicle ownership, with a wide range of mobility-related services and solutions.

2.      The Europcar Group operates through a diversified portfolio of brands meeting a wide variety of customer-specific needs and use cases.  The Europcar Group's four major brands include:  Europcar, the European leader of car and light commercial vehicle rental; Goldcar, the low-cost car-rental leader in Europe; InterRent, the 'mid-tier' car rental; and Ubeeqo, one of the

---

[2]    Capitalized terms used herein but not defined have the meanings ascribed to such terms in the Péligry Declaration.

European leaders of round-trip car-sharing. The Europcar Group delivers mobility solutions worldwide through its extensive network of direct and indirect subsidiaries, franchises, and business partners, including eighteen wholly-owned subsidiaries in Europe, two in Australia and New Zealand, and one in the United States.

3.       Despite the Europcar Group's historic success and worldwide presence, the COVID-19 pandemic has materially disrupted the travel and mobility service industries and significantly limited the Europcar Group's ability to generate revenue. The COVID-19 pandemic, coupled with the Debtor's capital structure and upcoming debt maturities, made apparent the need for a comprehensive restructuring transaction to right-size the Debtor's balance sheet and ensure a sustainable capital structure suited to its operational and strategic ambitions. The Debtor proactively engaged with its stakeholders prior to the Petition Date, announcing on October 26, 2020, that a *mandataire ad hoc* was appointed to oversee such negotiations. On November 17, 2020, the Debtor filed a request to terminate the mission of the *mandataire ad hoc* and to simultaneously appoint a conciliator to facilitate the finalization of the Agreement in Principle (as defined below). Consequently, on November 25, 2020, the Debtor and its key stakeholders entered into the Lockup Agreement[3] (defined below), positioning the Debtor for a smooth transition into the French Proceeding.

4.       On December 14, 2020, the Debtor commenced the French Proceeding pursuant to Articles L. 628-1 *et seq.* of the French Commercial Code. The ultimate goal of the French Proceeding is to restructure the obligations owed by the Debtor to its creditors and to implement the financial restructuring described in the Lockup Agreement (the "<u>Restructuring Transaction</u>") through an expedited financial safeguard plan (the "<u>SFA Plan</u>").

---

[3]    The Lockup Agreement was amended on December 6, 2020.

5.      The Restructuring Transaction and SFA Plan contemplate:   (a) a significant corporate deleveraging, with the reduction of the Debtor's corporate indebtedness through the equitization of €1,100 million in principal amount of its senior notes and term loan facility; (b) a significant new money injection consisting of new equity in the amount of €250 million and a new fleet financing facility in an amount up to €225 million; and (c) the refinancing of the Debtor's revolving credit facility.   All of these transactions are entirely backstopped by the members of the coordinating committee, which includes significant cross-holders of the Debtor's senior unsecured notes and interests in its term loan and revolving credit facility (the "Cross-Holders Coordinating Committee") and other holders of certain tranches of senior unsecured notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee.

6.      The SFA Plan, described in further detail below, is in line with the Debtor's corporate interests, provides a framework for long-term sustainability for the Debtor's businesses, employees, and customers, and offers its current shareholders an opportunity to participate in the Debtor's restructuring.   This comprehensive and rapid restructuring plan will allow the Debtor to properly reset its corporate capital structure and reshape the Europcar Group's operations around evolving customer needs and expectations.

7.      The Debtor commenced this chapter 15 case to facilitate the ongoing administration of the French Proceeding and enforce the terms of its eventual SFA Plan.   This chapter 15 case serves an important function in supporting the Debtor's French Proceeding and SFA Plan, principally by preventing certain of the Debtor's stakeholders from commencing actions in the United States that are more properly the subject of the French Proceeding.   Recognition of the French Proceeding will, among other things, ensure that the SFA Plan and any related restructuring

transactions are respected in the United States. For the reasons set forth herein, the Foreign Representative submits that the relief requested in the Petition is necessary and appropriate for the benefit of the Debtor, its creditors, and other parties in interest.

## **<u>Relief Requested</u>**

8.      The Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto (the "<u>Order</u>"): (a) granting the Petition and recognizing the French Proceeding as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) or, in the alternative, as a "foreign nonmain proceeding" (as defined in section 1502(5) of the Bankruptcy Code), and granting all of the relief afforded to such proceedings, pursuant to sections 1517(a) and (b) of the Bankruptcy Code; (b) recognizing the Foreign Representative as a "foreign representative" of the Debtor as defined in section 101(24) of the Bankruptcy Code; (c) finding that the Petition meets the requirements of section 1515 of the Bankruptcy Code; (d) granting all relief afforded a foreign main proceeding automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, subject to certain modifications described herein; (e) granting additional relief pursuant to section 1521 of the Bankruptcy Code; (f) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the French Proceeding and the SFA Plan, any order entered in respect of the Petition, this chapter 15 case, any further order for additional relief in this chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded to the Foreign Representative, including, without limitation, pursuant to section 1510 of the Bankruptcy Code; and (g) granting such other relief as the Court (as defined herein) deems just and proper.

## Jurisdiction and Venue

9.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated February 1, 2012.  The Foreign Representative confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with the Verified Petition to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     This chapter 15 case has been properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code by the filing of a petition for recognition of the French Proceeding under section 1515 of the Bankruptcy Code.

11.     This matter is a core proceeding within the meaning of 28 U.S.C. 157(b)(2)(P). Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).  The Debtor's principal assets in the United States are located in New York, New York.  Specifically, the Notes and certain of the Fox Rent-a-Car Guarantees (each as defined below) are governed by New York state law and contain a New York forum selection clause.

12.     The bases for the relief requested herein are sections 105(a), 362, 363, 1504, 1507, 1510, 1515, 1517, and 1521 of the Bankruptcy Code.

## Background

### I.    Europcar's Business Operations.

#### A.    Business Overview.

13.     The Debtor itself is a holding company and its principal assets consist of direct and indirect investments in its different subsidiaries that generate the Europcar Group's cash flow.  The

Europcar Group provides various mobility-related services and solutions, including: car rental and light commercial vehicle rental, chauffeur services, car-sharing, scooter-sharing, and private hire vehicle rental. With a 70-year history of service to the public as well as local and international companies, the Europcar Group represents an alternative to public transportation and private vehicle ownership, whether through short-term rentals or car sharing. The Europcar Group's corporate mission encompasses sustainability and "green" initiatives, and the Europcar Group has been awarded World Travel Awards for the World's Leading Green Transport Solution Company for five years running. The Europcar Group is an integral part of the supply chain and operating models of many companies, particularly in the distribution and logistics sector. The Europcar Group also provides services to the healthcare industry, the police, and central and local governments.

14. For the year ended December 31, 2019, the Europcar Group reported €278 million of adjusted corporate EBITDA on €3.022 billion of revenue. Historically, the Europcar Group's airport-located stations represented almost half its annual revenue, despite representing only about 17% of its total stations (by number). The ongoing deleterious impact of the COVID-19 pandemic on air travel has significantly constrained revenue at the Europcar Group's airport stations and, thus, overall.

15. The Europcar Group operates mainly in Europe through its directly operated and agent-operated stations. It is also present internationally through its franchises as well as via partnerships and general sales agency agreements. The Europcar Group's directly- and agent-operated stations are located in countries in which the Europcar Group has a longstanding local presence and expertise, while franchise stations extend the Europcar Group's network around the

world, bringing the Europcar Group's range of services to a wider customer base and increasing the reputation of its brands worldwide.

16.    As more fully set forth in the Péligry Declaration, the Europcar Group operates primarily through four core brands that meet the various mobility needs of its broad customer base: Europcar, Goldcar, InterRent, and Ubeeqo.  The Europcar Group covers the traditional and upscale market with its Europcar brand, the mid-range market with its InterRent brand, the low-cost market with its Goldcar brand, and the urban mobility market with its Ubeeqo brand.  These four core brands serve a 27% share of the European market, making the Europcar Group the undisputed car rental leader in Europe.  In 2019, the Europcar brand also expanded into the United States, Finland, and Norway, in both the leisure and business markets.

## II.    Europcar's Prepetition Corporate and Capital Structure.

17.    The Debtor is a *société anonyme* organized under the laws of France, and its common shares are publicly traded and listed on the Euronext Paris Exchange.  As of December 31, 2019, the Debtor's share capital was divided into 163,884,278 ordinary shares with a par value of €1 each.  As of December 31, 2019, a significant portion of the Debtor's shares and exercisable voting rights were held by Eurazeo SE (29.89% and 31.51%, respectively).[4]  A simplified chart depicting Europcar's organizational structure is attached to the Péligry Declaration as Exhibit A.

18.    As of the Petition Date, the Debtor is borrower or issuer on a principal amount of prepetition funded indebtedness totaling approximately €2.12 billion of Euro-denominated debt, comprising the main debt instruments as described in the following sections, and has guaranteed

---

[4]    As of December 31, 2019.

certain obligations of certain of its subsidiaries, including approximately $236.6 million of U.S. dollar-denominated obligations of U.S. subsidiary Fox Rent-a-Car.[5]

     **A.**     **2024 Senior Notes.**

19.     On November 2, 2017, the Debtor's subsidiary, Europcar Drive D.A.C. ("Europcar Drive") issued Senior Notes in the amount of €600 million due November 15, 2024 and paying 4.125% annual interest ("2024 Senior Notes"), under the terms of an indenture between Europcar Drive as issuer, and The Bank of New York Mellon, London Branch as trustee (the "Notes Trustee"), transfer and principal paying agent, and security agent, and The Bank of New York Mellon S.A./N.V., Luxembourg Branch as Luxembourg depositary and paying agent, as amended pursuant to a supplemental indenture dated October 13, 2020, and as further amended pursuant to a supplemental indenture dated December 7, 2020, and as further amended from time to time.  The 2024 Senior Subordinated Notes were listed for trading on the Euro MTF Market of the Luxembourg stock exchange.  On December 19, 2017, the Debtor assumed all the obligations of Europcar Drive as issuer of the 2024 Senior Notes.

     **B.**     **2026 Senior Notes.**

20.     On April 24, 2019, the Debtor's subsidiary, Europcar Mobility Drive D.A.C. ("Europcar Mobility Drive"), issued senior notes in the amount of €450 million due April 30, 2026 and paying 4.000% annual interest ("2026 Senior Notes, and together with the 2024 Senior Notes, the "Senior Notes"), under the terms of an indenture between Europcar Mobility Drive as issuer, and the Notes Trustee as trustee, transfer and principal paying agent, and security agent for the 2026 Senior Subordinated Notes, and The Bank of New York Mellon S.A./N.V., Luxembourg Branch as Luxembourg depositary and paying agent, as amended pursuant to a supplemental

---

[5]    The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

indenture dated October 13, 2020, and as further amended pursuant to a supplemental indenture dated December 7, 2020, and as amended from time to time. The 2026 Senior Notes were listed for trading on the Euro MTF Market of the Luxembourg stock exchange. On June 15, 2019, the Debtor assumed all the obligations of Europcar Mobility Drive as issuer of the 2026 Senior Notes, and gross proceeds from the issuance of 2026 Senior Notes were assigned to the Debtor.

C.    **Fleet Notes.**

21.    On November 2, 2017, EC Finance Plc ("ECF"), an "orphan SPV" established for the purpose of issuing the Fleet Notes (as defined below), issued 2.375% senior secured notes for a principal amount of €350 million due in 2022 (the "Fleet Notes, and together with the Senior Notes, the "Notes") pursuant to an indenture between, *inter alia*, ECF, as issuer, the Debtor as guarantor, The Bank of New York Mellon, London Branch as trustee, transfer and principal paying agent and security agent, and The Bank of New York Mellon SA/NV, Luxembourg Branch as depositary and Luxembourg transfer and paying agent, as amended pursuant to a supplemental indenture dated October 13, 2020, and as further amended pursuant to a supplemental indenture dated December 7, 2020, and as amended from time to time. The Fleet Notes are admitted to trading on the Euro MTF market of the Luxembourg Stock Exchange. On June 29, 2018, ECF issued new senior notes bearing interest at a rate of 2.375% for a total amount of €150 million due 2022, also guaranteed by the Debtor. As a result of this second issuance, €500 million in aggregate principal amount of Fleet Notes are outstanding as of the date hereof.

D.    **Revolving Credit Facility.**

22.    On July 13, 2017, the Debtor entered into a €500 million senior revolving credit facility (the "RCF"), pursuant to a revolving credit facility agreement (as amended from time to

time, the "RCF Agreement") between, *inter alia*, the Debtor and several of its subsidiaries[6] as borrowers, Bank of America Merrill Lynch International Limited and others[7] as bookrunners, several banks[8] as mandated lead arrangers and lenders, and Crédit Agricole Corporate and Investment Bank as agent and security agent. The RCF Agreement contains a cross-default provision providing that any payment default of the Debtor or its subsidiaries under the Notes constitutes a default under the RCF Agreement. The RCF Agreement was amended on May 29, 2019, in order to, among other things, increase the total committed amount by €150 million, bringing the total maximum amount to €650 million. In May 2020, a new additional tranche of €20,000,000 has been added to the RCF as an "incremental facility," bringing the total maximum amount to €670 million. The RCF is maturing in June 2023.

### E.    CS Facility.

23.    On December 27, 2019, the Debtor entered into a €50 million unsecured term loan (the "CS Facility") pursuant to that certain term loan facility agreement, dated as of December 27, 2019, between the Debtor, as borrower, and Crédit Suisse International, as original lender, agent, and calculation agent. The CS Facility matured on December 6, 2020.

### F.    The Fox Rent-a-Car Guarantees.

24.    The Debtor has guaranteed certain U.S. dollar-denominated obligations of its U.S. subsidiary, Fox Rent-a-Car (the "Fox Rent-a-Car Guarantees"), in connection with Fox

---

[6]    These subsidiaries include Europcar International S.A., Europcar Holding S.A.S, Europcar Autovermietung GmbH, Europcar France S.A.S., Europcar International S.A.S.U. & Co OHG, and Europcar IB, S.A.U.

[7]    Additional bookrunners include BNP Paribas, Crédit Agricole Corporate and Investment Bank, Deutsche Bank AG, London Branch, HSBC France, Natixis, and Société Générale Corporate and Investment Banking.

[8]    These banks include Banco Bilbao Vizcaya Argentaria S.A., Paris Branch, Bank of America Merrill Lynch International Limited, BNP Paribas, Crédit Agricole Corporate and Investment Bank, Crédit Industriel et Commercial, Deutsche Bank AG, London Branch, Goldman Sachs International, HSBC France, ING Bank N.V., French Branch, KBC Bank N.V., French Branch, Lloyds Bank plc, Natixis, and Société Générale Corporate and Investment Banking and National Westminster Bank plc (formerly known as The Royal Bank of Scotland plc).

Rent-a-Car's business operations within the United States. Half of the Fox Rent-a-Car Guarantees are governed by the laws of the state of New York and contain New York forum selection clause; others are governed by the laws of the states of Massachusetts, Minnesota, and New Jersey, as applicable.

### III.    The French *Sauvegarde Financière Accélérée* (or "<u>Expedited Financial Safeguard</u>") Proceeding.

25.    As more fully set forth in the Kopf Declaration, French expedited financial safeguard proceedings are opened at the request of a debtor already involved in ongoing conciliation proceedings. Conciliation proceedings are court-assisted, preventive, and confidential proceedings aimed at facilitating negotiations and reaching a consensual workout agreement between a company and its creditors under the supervision of a court-appointed agent, the *conciliateur*. To open expedited financial safeguard proceedings, the debtor must demonstrate to the French court that it meets certain eligibility requirements, including that the restructuring proposal prepared in the framework of conciliation proceedings is sufficiently supported by the company's financial creditors so that its approval by at least a two-thirds majority of the company's financial creditors (including bond and noteholders, where applicable) is likely to occur within the expedited deadlines imposed by the expedited financial safeguard proceedings. Issuance of the opening judgment in an expedited financial safeguard proceeding triggers an automatic stay that prohibits payment of financial prepetition debts to and enforcement actions by the financial creditors whose debts are subject to the proceeding, but not trade creditors, whose claims are paid in the ordinary course and otherwise "ride through" unimpaired.

A.    **Europcar's Conciliation and the French Proceeding.**

26.    On March 23, 2020, the Europcar Group announced that its business had been affected by the crisis caused by the ongoing COVID-19 pandemic.[9]  Throughout this global pandemic and concurrent economic crisis, the Europcar Group's priorities have been the safety of its customers and its employees, the implementation of exceptional cost-saving and cash preservation measures to navigate through the next months of crisis as best it can, and contributing to fighting the epidemic by making vehicles available to people and businesses that are on the front line (e.g., healthcare workers and retailers delivering essential goods).

27.    On September 7, 2020, as a next step in addressing the operational and capital structure strain caused by the ongoing global pandemic, the Europcar Group announced its intention to commence discussions with its corporate debt creditors with a view to achieving a financial restructuring.  Following the receipt of requisite consents of various groups of creditors to the potential appointment of a *mandataire ad hoc* and/or of a *conciliateur* with respect to the Debtor, the Europcar Group announced on October 26, 2020 that a *mandataire ad hoc* was appointed in respect of the Debtor.

28.    Under the aegis of the *mandataire ad hoc*, the Debtor engaged in discussions with certain of its main corporate creditors and their respective advisors, which led to an agreement in principle (the "Agreement in Principle") supported by (a) the Debtor and its non-Debtor subsidiaries and (b) the members of the Cross-Holders Coordinating Committee.

29.    To facilitate the finalization of the Agreement in Principle, on November 17, 2020, the Debtor filed a request to terminate the mission of the *mandataire ad hoc* and to simultaneously

---

[9]    Europcar    Mobility    Group,    Universal    Registration    Document    32    (2019),
https://investors.europcar-group.com/static-files/a1384769-8dfc-4cf7-9896-903381b0ea61.

appoint a conciliator.   As noted in the Kopf Declaration, prior to commencing the French Proceeding, the French Court opened conciliation proceedings for the benefit of the Debtor on November 19, 2020 (the "Conciliation").   During the course of the Conciliation, with the assistance of the court-appointed *conciliateur* Maître Hélène Bourbouloux, the Debtor held multiple meetings with its creditors regarding the terms of a comprehensive debt restructuring. This culminated in the negotiation of waivers of certain events of default that would otherwise have been triggered by the opening of the French Proceeding and an agreement in principle on the terms of a lockup agreement, which, on November 25, 2020 (the "Lockup Agreement"), was executed by the Debtor with the members of the Cross-Holders Coordinating Committee, representing approximately 51.1% of the 2024 Senior Notes, approximately 72.7% of the 2026 Senior Notes, 100% of the CS Facility, approximately 45.7% of the RCF commitments, and approximately 22.2% of the Fleet Notes.   On December 6, 2020, the Lockup Agreement was amended to open the backstop arrangements to the other holders of 2024 Senior Notes and 2026 Senior Notes and to extend the subscription period with respect to the New Money (as defined below) and the refinancing of the RCF.   The Lockup Agreement memorializes creditor support for the terms of the Restructuring Transactions.   Because such support fell short of the 100% consent required to approve the restructuring plan absent the opening of the French Proceeding, but having received sufficient support from its lenders to open the French Proceeding, the Debtor filed a *demande d'ouverture de procédure de sauvegarde financière accélérée* (i.e., petition for expedited financial safeguard) on December 9, 2020.   The French Court heard the petition and orally issued the Opening Judgment formally opening the French Proceeding on December 14, 2020.[10]

---

[10]    The Debtor will file the written version of the Opening Judgment and an English translation of the written Opening Judgment with the Court after the written Opening Judgment becomes available from the French Court.

B.      **The Debtor's SFA Plan.**

30.     Following issuance of the Opening Judgment on December 14, 2020, the Debtor

expects to distribute the SFA Plan to financial creditors entitled to vote thereon.  The vote of the

affected creditors to approve or reject the SFA Plan will be convened on January 7, 2021.

31.     The framework of the SFA Plan contemplates a comprehensive deleveraging of

Europcar's balance sheet through a combination of:

  a.      €480 million in new-money financing (the "New Money"), made available
          to the Debtor and its affiliates, as follows:

    i.      €225 million new revolving fleet financing (the "Fleet Financing
            New Money") made available to the Europcar Group by subscribing
            holders of the Senior Notes, maturing December 2024, fully
            backstopped in cash by the members of the Cross-Holders
            Coordinating Committee and other holders of the Senior Notes who
            commit to backstop on the same terms and conditions as those
            applicable to the Cross-Holders Coordinating Committee;

    ii.     €255 million of New Money in equity through:

      (a)     a rights issue of €50 million with preferential subscription
              rights for the benefit of existing shareholders by issuance of
              new shares, fully backstopped in cash by the members of the
              Cross-Holders Coordinating Committee and other holders of
              the Senior Notes who commit to backstop on the same terms
              and conditions as those applicable to the Cross-Holders
              Coordinating Committee;

      (b)     a share capital increase of €200 million reserved to the
              holders of the Senior Notes by issuance of new shares, fully
              backstopped in cash by the members of the Cross-Holders
              Coordinating Committee and other holders of the Senior
              Notes who commit to backstop on the same terms and
              conditions as those applicable to the Cross-Holders
              Coordinating Committee (the "Senior Noteholders Capital
              Increase");

      (c)     a share capital increase of €5 million following the exercise
              of Penny Warrants (as defined below);

  b.      full equitization of:

      iii.      the principal amount (plus accrued and unpaid interest, including the coupon due on November 16, 2020 and which will not be paid at the end of the 30-day grace period) of the 2024 Senior Notes;

      iv.      the principal amount (plus accrued and unpaid interest, including the coupon due on October 30, 2020 and which will not be paid at the end of the 30-day grace period) of the 2026 Senior Notes;

      v.      the principal amount (plus accrued and unpaid interest) of the CS Facility.

c.      Refinancing of the RCF (the "RCF Refinancing"):

      vi.      refinancing of the €670 million RCF through the granting to the Debtor and other relevant non-Debtor subsidiary entities of a €170 million revolving credit facility (opened to all the holders of Senior Notes with an oversubscription option) and a €500 million term loan facility (opened in priority to all lenders under the RCF, and then to all holders of Senior Notes if any remaining amount, each time with an oversubscription option), maturing June 2023, fully backstopped in cash by the members of the Cross-Holders Coordinating Committee and other holders of Senior Notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee;

d.      Allocation of penny warrants (the "Penny Warrants"):

      vii.      The issuance of Penny Warrants to the members of the Cross-Holders Coordinating Committee, the lenders under the RCF, and holders of Senior Notes, as a result of their coordination efforts, their subscription undertakings, and their backstop arrangements, as applicable, consistent with the terms of the definitive documents.

32.      Assuming the requisite approvals of the creditors are obtained, the Debtor will seek approval of the SFA Plan at an extraordinary general meeting of its shareholders.  Such approval is required to modify the Debtor's bylaws in order to implement certain equitization transactions contemplated by the SFA Plan.  As a French listed company, the threshold for a quorum at the extraordinary general meeting is 25% of the shareholders on the first convening notice and 20% on the second.  The voting shareholders must approve the SFA Plan by a two-thirds majority for

it to become effective.[11]   Under the SFA Plan, existing shareholders will retain their equity interests, subject to dilution on account of the equity rights offering and equitization of the Senior Notes and CS Facility plus accrued interest.

33.    This comprehensive restructuring will be effected over the course of the next few months.  The Debtor expects to submit a final form of the SFA Plan to a vote of affected creditors on or around January 7, 2021.  The Debtor also expects to submit certain terms of the SFA Plan to a vote of its shareholders at a general meeting on or around January 20, 2021.  In the event that the Debtor's shareholders vote in favor of the SFA Plan, the French Court will hold a hearing to consider approval of the SFA Plan and the transactions contemplated thereby, likely before the end of January 2021.  If the French Court is satisfied that the SFA Plan meets the applicable requirements of French law, the SFA Plan will be approved and the Debtor and its stakeholders will proceed with consummation thereof, including the infusion of additional new money financing and the equitization of up to approximately €1,100 million in principal amount of the Senior Notes and CS Facility.

34.    In the event that the Debtor's shareholders vote against at least one of the resolutions under the SFA Plan, the SFA Plan cannot be approved by the French Court. Consequently, the Debtor would petition the French Court to terminate the French Proceeding and file for *redressement judiciaire* (rehabilitation proceedings) or *liquidation judiciaire* (liquidation proceedings).

---

[11]    By exception, the French Court may hold that the SFA Plan may be approved by a simple 50% majority on the first convening notice if a quorum representing at least 50% of shareholders is reached.

**Basis for Relief**

35.     Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets, and to facilitate the rehabilitation and reorganization of businesses.  The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

36.     Consistent with these principles, the Foreign Representative commenced an ancillary proceeding for the Debtor under chapter 15 of the Bankruptcy Code to obtain recognition of the French Proceeding and certain related relief.  The Foreign Representative believes that this chapter 15 case will complement the Debtor's primary proceeding in France to ensure the effective and economic administration of the Debtor's restructuring efforts and prevent parties from taking action in the United States that jeopardizes these efforts.

**I.      The Debtor Is Eligible for Chapter 15 Relief.**

37.     The Debtor is eligible to be a debtor in a chapter 15 case.  For the purposes of chapter 15 of the Bankruptcy Code, a "debtor" means an entity that is the subject of a foreign proceeding.  *See* 11 U.S.C. § 1502(1); *see also* 11 U.S.C. § 101(15), (41) (defining "entity" and "person").  The Debtor is a *société anonyme* organized under the laws of France.  As set forth below, the French Proceeding is a foreign proceeding as that term is defined in the Bankruptcy Code.  The Debtor does not fall within any of the categories of entities excluded from chapter 15 eligibility, as set forth in section 1501(c).  Accordingly, the Debtor is eligible for relief under chapter 15 of the Bankruptcy Code.  *See* 11 U.S.C. § 1501(b), (c).

II.     **The French Proceeding Should Be Recognized as a Foreign Main Proceeding or, in the Alternative, as a Foreign Nonmain Proceeding.**

38.     Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main (or nonmain) proceeding if (a) such foreign proceeding is a foreign main (or nonmain) proceeding within the meaning of section 1502 of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a).  As explained below, the French Proceeding, the Foreign Representative, and the Petition satisfy all of the foregoing requirements.

A.     **The French Proceeding Is a Foreign Proceeding.**

39.     Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

40.     Courts have held that a "foreign proceeding" is:

a.     a proceeding;

b.     that has either a judicial or an administrative character;

c.     that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.     that is located in a foreign country;

e.     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.     which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) ("(i) [The existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.") (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013) (listing the seven factors); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the Péligry Declaration, the French Proceeding satisfies such requirements and, therefore, qualifies as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

41. **First**, the French Proceeding is a proceeding commenced pursuant to Articles L. 628-1 *et seq.* of the French Commercial Code, the French law that governs corporate reorganizations and provides for a restructuring of a company's financial obligations. For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278. Because the French Proceeding operates under such statutory framework, it satisfies the first factor of section 101(23) of the Bankruptcy Code.

42. **Second**, the French Proceeding is judicial in character. A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010). In the Debtor's French Proceeding, the French Court has exclusive jurisdiction and the Debtor's assets and affairs are subject to the supervision of the *juge-commissaire* who, among other things, must authorize any sale of the

Debtor's assets outside the ordinary course of business, or the granting of any security interest in the Debtor's assets. Moreover, the scope of the court-appointed *administrateur judiciaire*'s duties—which includes assisting the Debtor's management or monitoring the Debtor—is decided by the French Court, and the *administrateur judiciaire* reports to the French Court in the event of an issue requiring its input. Additionally, as described herein, the French Court must also approve the SFA Plan (including any reorganization of the Debtor's assets and affairs regulated under the SFA Plan) for the SFA Plan to take effect.

43.     ***Third***, the French Proceeding is collective in nature in that all affected creditors are allowed to participate. In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *See* 400 B.R. at 281; *see also In re Poymanov*, 571 B.R. 24, 33 (Bankr. S.D.N.Y. 2017) ("A proceeding is collective if it considers the rights and obligations of all of a debtor's creditors, rather than a single creditor."). The French Proceeding is accordingly intended to affect creditors according to their interests collectively, rather than to benefit any single creditor alone. A *mandataire judiciaire*, appointed to represent the creditors, is entitled to act in the name of and on behalf of all creditors to, among other things, verify the debtors' liabilities. Moreover, a committee of financial institutions that are lenders under the Debtor's prepetition credit facilities, which will be impacted by the SFA Plan, has been appointed. The lenders comprising the committee consulted on the SFA Plan in connection with the conciliation and will participate in and vote on the SFA Plan. Accordingly, the French Proceeding considers the rights and obligations of all of the Debtor's financial creditors collectively rather than evaluating those of any single creditor.

44.    **Fourth**, the French Proceeding is conducted in a foreign country, namely France, and the French Court that will oversee the case is located in Paris, France.

45.    **Fifth**, as described above, a "foreign proceeding" is "a law relating to insolvency or adjustment of debt." Notably, the definition of "foreign proceeding" in the Bankruptcy Code differs from the definition found in the Model Law because the Bankruptcy Code includes the words "or adjustment of debt." *See In re Millard*, 501 B.R. 644, 649–50 (Bankr. S.D.N.Y. 2013) ("Likewise, *Collier* explains that '[t]he words "under a law relating to insolvency or adjustment of debt" [in section 101(23)] emphasize that chapter 15 is available not only to debtors that are technically insolvent or facing liquidation, but also to debtors who are in financial distress and may need to reorganize.'" (quoting 8 Collier ¶ 1501.03 (16th 2018))). Moreover, the phrase "relating to" is interpreted broadly. *See, e.g.*, *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) ("ordinary meaning of . . . words ['relating to'] is a broad one") (citation omitted); *California Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."). Here there is little doubt that the French Proceeding conducted under the French Law is a proceeding under either (a) "a law relating to insolvency" or (b) "a law relating to . . . adjustment of debt."

46.    With respect to the "relating to" provision, the expression "pursuant to a law relating to insolvency" refers to proceedings involving companies that are insolvent or in severe financial distress. *See* UNCITRAL Model Law on Cross-Border Insolvency with Guide to Interpretation and Enactment (January 2014) at 73. An expedited financial safeguard proceeding is governed by Book VI of the French Commercial Code, a section that governs corporate

restructurings and is recognized as an insolvency proceeding under the Council Regulation (EC) Regulation No. 1346/200 dated May 29, 2000, on Insolvency Proceedings (as modified) and the recasting Regulation No. 2015/848, dated May 20, 2015, on Insolvency Proceedings. One of the conditions for the opening of expedited financial safeguard proceedings in relation to a debtor under the French Law is whether the debtor has not been insolvent for more than 45 days at the time that the petition for conciliation was filed, while still experiencing difficulties. At the outset of the French Proceeding, the French Court found that the Debtor satisfied this test. Furthermore, the purpose of an expedited financial safeguard proceeding is to seek to reorganize a debtor through an expedited financial safeguard plan, which is similar to a plan of reorganization under the Bankruptcy Code.

47.    ***Sixth***, the French Proceeding subjects the Debtor's assets and affairs to the supervision of the French Court for the duration of the proceeding. As an example, the *juge-commissaire* must authorize any sale of the Debtor's assets outside the ordinary course of business, or the granting of any security interest in the Debtor's assets, and an automatic stay arose upon entry of the Opening Judgment that prohibits payment of certain prepetition debt and enjoins creditors from commencing or continuing legal actions against the Debtor to obtain payment. Moreover, a court-appointed administrator, whose duties are determined by the French Court, assists the Debtor's management or monitors the Debtor and reports back to the French Court with any issues requiring the French Court's input. Additionally, as mentioned above, the French Court must also approve the SFA Plan (including any reorganization of the debtors' assets and affairs regulated under the SFA Plan) for the SFA Plan to take effect.

48.    ***Finally***, the objective of the French Proceeding is the reorganization of the Debtor. The principal objective of the French Proceeding is to facilitate the reorganization of a business

through approval of the SFA Plan in order that the Debtor's business operations may be continued, the employment of its personnel maintained, and its liabilities restructured. The SFA Plan will provide for a recapitalization of the Debtor and will govern the global financial restructuring of the Debtor's indebtedness. Therefore, the Foreign Representative submits that the Debtor has commenced the French Proceeding for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code. *Cf. In re Avánzit*, 385 B.R. at 533–34 (recognizing a "financial restructuring" as a "reorganization" for purposes of the sections 101(23) and 1517 analysis, especially where debts will be repaid through the plan at issue).

49.     The Foreign Representative submits that the French Proceeding satisfies all of the criteria required under section 101(23) of the Bankruptcy Code and that the French Proceeding is a foreign proceeding entitled to recognition under chapter 15 of the Bankruptcy Code.

**B.     The French Proceeding Is a Foreign Main Proceeding.**

50.     The French Proceeding should be recognized as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code. A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests. 11 U.S.C. § 1517(b). The term "center of main interests" (or "COMI") is not defined in the Bankruptcy Code. COMI, however, has been equated to a debtor's principal place of business. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) (citing *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 633–34 (E.D. Calif. 2006)). Courts have identified certain factors that are relevant in determining a debtor's COMI, including: (a) the location of the debtor's headquarters; (b) the location of those persons or entities that actually manage the debtor (which, in certain instances, could be the headquarters of a holding company); (c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's creditors or of a

majority of the creditors who would be affected by the case. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006). In the absence of evidence to the contrary, a debtor's registered office is presumed to be the debtor's COMI. *See* 11 U.S.C. § 1516(c).

51.     Here, under all the relevant criteria, France is the Debtor's COMI. As set forth in the Péligry Declaration:

a.     the Debtor's registered office and corporate headquarters are located at 13 ter Boulevard Berthier, 75017 Paris, France;

b.     the Debtor is primarily controlled by, and decision-making is made from, its headquarters in Paris, France;

c.     the Debtor is a publicly traded company listed on the Euronext Paris Exchange;

d.     major components of the Debtor's workforce, assets, and operations are located in France; and

e.     a material portion of the Debtor's administrative functions, including accounting, financial reporting, budgeting, and cash management, are conducted in France.

52.     Courts have found COMI in other chapter 15 cases that had fewer connections than those present here. *See, e.g., In re Gandi Innovations Holdings, LLC*, No. 09-51782-C, 2009 WL 2916908, at *2 (Bankr. W.D. Tex. June 5, 2009) (finding Canada to be debtor's COMI despite mixed results, for example, senior management was located in Ontario, but assets, employees, and operations were both in Texas and Ontario); *In re Ernst & Young, Inc.*, 383 B.R. 773, 780–81 (Bankr. D. Colo. 2008) (finding COMI in Canada notwithstanding the fact that two of the factors— the location of the debtors' creditors and applicable law—yielded inconclusive and possibly contrary results). Based on foregoing factors, the Debtor's COMI is in France and, as such, the French Proceeding should be recognized as a foreign main proceeding.

C.      **In the Alternative, the French Proceeding is a Foreign Nonmain Proceeding.**

53.      In the alternative, if this Court concludes that the Foreign Proceeding is not a "foreign main proceeding," the French Proceeding should be recognized as a "foreign nonmain proceeding" under section 1502(5) of the Bankruptcy Code.

54.      A "foreign nonmain proceeding" is defined as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." *See* 11 U.S.C. § 1502(5); *see also* 11 U.S.C. § 1517(b)(2) (providing that an order of recognition as a "foreign nonmain proceeding" shall be entered "if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending"). An establishment is "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). "Nontransitory economic activity" is not defined in the Bankruptcy Code, but has been referred to as 'a local place of business.'" *See In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y 2016) (holding that in order to have an establishment in a country a debtor must "conduct business in that country."); *see also Lavie v. Ran*, 607 F.3d 1017, 1027 (5th Cir. 2010) (holding that the definition of establishment requires "a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional."); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 131 (Bankr. S.D.N.Y 2007) (holding that the requirements of a "place of operations" from which "economic activity" is conducted require a seat for local business activity that has a local effect on the markets); *In re British Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010) (holding same). As with determining a debtor's COMI, courts determine whether a debtor has an establishment in a country as of the time of the filing of the chapter 15 petition. *See Lavie v. Ran (In re Ran)*, 406 B.R. 277, 284–85 (S.D. Tex. 2009).

26

55.     As described above, the Debtor maintains its corporate office in Paris, France where

officers execute treasury functions and approve key vendor payments.   Further, most board

meetings are chaired and convened at the Paris office, and Paris is where the Debtor has managed

the restructuring.   Given the material and substantive activities conducted by the Debtor in Paris,

and the Debtor's corporate office being located in Paris, the Debtor demonstrably has a local and

non-transitory place of business, and hence, an establishment, in France.

**D.      The Chapter 15 Case Has Been Commenced by a Duly Authorized Foreign
Representative.**

56.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall

apply for recognition of the foreign proceeding.   Section 101(24) of the Bankruptcy Code defines

"foreign representative":

> The term "foreign representative" means a person or body, including a person or
> body appointed on an interim basis, authorized in a foreign proceeding to
> administer the reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

57.     The relevant authorizing board of the Debtor previously met and authorized by

resolution the commencement of the French Proceeding, wherein the Foreign Representative was

appointed to act as the "foreign representative" of the Debtor, and this chapter 15 case.   Bankruptcy

courts have held that a governing body of an entity may authorize a person to act as that entity's

foreign representative in a chapter 15 proceeding.   *See In re Cell C Proprietary Ltd.*, 571 B.R. 542,

553 (Bankr. S.D.N.Y. 2017) (recognizing that "section 101(24) does not require that a foreign

representative be judicially appointed" and "that a board of directors may authorize a person to act

as the corporation's foreign representative in a chapter 15 proceeding"); *see also In re OAS S.A.*,

533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015) (holding that individual appointed by board qualified as

a "foreign representative"); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182

(MG), 2010 WL 10063842 at *2 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).   The Foreign

Representative is a "person" under section 101(41) of the Bankruptcy Code.   The Foreign

Representative thus submits that he has met the requirements of section 101(24) of the

Bankruptcy Code and is the Debtor's "foreign representative" as defined therein.

### E. The Petition Satisfies the Requirements of Section 1515 of the Bankruptcy Code.

58.     Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition must

be accompanied by one of the following:

a.   a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

b.   a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

c.   in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

59.     In satisfaction of section 1515(b) of the Bankruptcy Code, the Péligry Declaration

describes the existence of the French Proceeding and the appointment of the Foreign

Representative as the "foreign representative" of the Debtor, independently satisfying

section 1515(b)(3) of the Bankruptcy Code.[12]  *See In re Cell C Proprietary Ltd.*, 571 B.R. 542,

553 (Bankr. S.D.N.Y. 2017); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, (Bankr. D. Del.

2010) (holding that declaration of petitioner "is acceptable evidence under § 1515(b)(3) of the

existence of the foreign proceeding and the appointment of the [f]oreign [r]epresentatives."), *aff'd*,

728 F.3d 301 (3d Cir. 2013).   Therefore, the Petition meets the requirements of section 1515 of

the Bankruptcy Code in satisfaction of the third requirement under section 1517(a) of the

---

[12]   The Foreign Representative will also file an English language version of the Opening Judgment when it becomes available.

Bankruptcy Code.  Because the Petition satisfies section 1517 of the Bankruptcy Code, the Court

should recognize the French Proceeding in this chapter 15 case.  Moreover, granting recognition

will promote the United States public policy of respecting foreign proceedings as articulated in,

*inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between

courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.

Thus, these circumstances satisfy the conditions for mandatory recognition of the French

Proceeding under section 1517 of the Bankruptcy Code.

### III.    The Automatic Stay Should Be Modified to Be Coterminous with the Stay in Effect in the French Proceeding.

60.    Normally, recognition of a foreign proceeding as a "foreign main proceeding"

triggers the application of the automatic stay under section 362 of the Bankruptcy Code to the

debtor and the property of the debtor that is within the territorial jurisdiction of the United States.

11 U.S.C. § 1520(a)(1).  Such a stay would be more expansive than the stay in effect in the French

Proceeding, which only applies to financial (but not trade) creditors, with the potential unintended

effect of disrupting the Debtor's commercial relationships with its trade creditors and ongoing

operations.  Accordingly, the Debtor respectfully requests, pursuant to sections 105(a), 362(a), and

362(d) of the Bankruptcy Code, that the automatic stay be deemed modified to apply only to those

matters stayed in the French Proceeding.  *See In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R.

169, 185 (Bankr. S.D.N.Y. 2017) (allowing modification of those affected by the automatic stay);

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 370 (1988)

(holding that parties in interest may file for relief from the automatic stay); *In re Martin Paint*

*Stores*, 199 B.R. 258, 264 (Bankr. S.D.N.Y. 1996), *aff'd sub nom. S. Blvd., Inc. v. Martin Paint*

*Stores*, 207 B.R. 57 (S.D.N.Y. 1997) ("'Party in interest' is to be interpreted broadly to allow those

parties affected by the chapter 11 case to be heard."); *see also In re Technicolor S.A.*, No. 20-33113

(DRJ) (Bankr. S.D. Tex. June 22, 2020) (modifying the automatic stay to apply only to matters stayed in the debtor's *sauvegarde financière accélérée* proceeding).

61.    The opening of the French Proceeding triggered an automatic stay that prohibits payment of prepetition debts to financial creditors of the Debtor and prevents financial creditors impacted by the French Proceeding from commencing or continuing legal actions against the debtor to obtain payment of a prepetition claim, subject to certain exceptions.  Payment to and enforcement by trade creditors is not stayed by the French Proceeding, as such creditors are expected to "ride through" the Debtor's (purely financial) restructuring under applicable French law.  Accordingly, cause exists to modify the stay in this limited fashion to apply only to those matters stayed in the French Proceeding because such relief will permit the Debtors to continue to satisfy its obligations to its trade creditors in accordance with applicable law (including French law).

## IV.    Recognition of the French Proceeding Is Not Contrary to U.S. Public Policy.

62.    A court may deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Courts that have addressed the "public policy exception" in section 1506 of the Bankruptcy Code have noted that the exception is narrow, its application restricted to the most fundamental policies of the U.S., and a foreign judgment should generally be accorded comity if the foreign jurisdiction's proceedings meet fundamental standards of fairness.  *Oilsands Quest Inc.*, 484 B.R. 593, 597 (Bankr. S.D.N.Y. 2012); *see also In re Metcalfe*, 421 B.R. at 697 (holding that a U.S. bankruptcy court is not required to make an independent determination about the propriety of the acts of a foreign court, but only whether their procedures meet U.S. standards of fundamental fairness).  The relief granted in a foreign proceeding and the relief available in a U.S. proceeding need not be identical.  Courts have even gone so far as to hold that even the absence of a jury trial right—a right embodied in the U.S.

Constitution—in a foreign proceeding would not justify the court's refusal to recognize the foreign proceeding pursuant to the public policy exception. *See In re Ephedra Products Liab. Litig.*, 349 B.R. 333, 335–36 (Bankr. S.D.N.Y. 2006).

63. Here, recognition of the French Proceeding, and any orders issued by the French Court during the pendency of the French Proceeding, would not be "manifestly contrary to the public policy of the United States" so as to justify refusal to recognize the French Proceeding and enforce the French Court's order. As more fully set forth in the Kopf Declaration, the French Proceeding affords the Debtor's stakeholders—including its creditors and equity holders—a full and fair opportunity to participate therein, consistent with U.S. standards of fundamental fairness.

## Conclusion

64. The Petition satisfies the requirements for the recognition of the Foreign Representative as the Debtor's "foreign representative" and the French Proceeding as the Debtor's "foreign main proceeding," or, in the alternative, the Debtor's "foreign nonmain proceeding" and further requests entry of an order, substantially in the form attached hereto, granting the relief requested herein.

## Notice

65. The Foreign Representative will provide notice of this motion to: (a) the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (b) all persons authorized to administer the foreign proceeding of the Debtor; (c) all parties to litigation pending in the United States in which the Debtor is a party as of the Petition Date; (d) counsel to the Cross-Holders Coordinating Committee; and (e) such other entities as this Court may direct. In light of the nature of the relief requested, the Foreign Representative submits that no further notice is required.

WHEREFORE, the Foreign Representative requests entry of the Order, substantially in the

form attached hereto, granting the relief requested herein and such other and further relief as is just

and proper.

New York, New York                      */s/ David R. Seligman, P.C.*
Dated:  December 17, 2020          David R. Seligman, P.C.
                                                  Susan D. Golden
                                                  **KIRKLAND & ELLIS LLP**
                                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                                  601 Lexington Avenue
                                                  New York, New York  10022
                                                  Telephone:     (212) 446-4800
                                                  Facsimile:     (212) 446-4900

                                                              - and -

                                                  Christopher M. Hayes (*pro hac vice* pending)
                                                  Alexander D. McCammon (*pro hac vice* pending)
                                                  **KIRKLAND & ELLIS LLP**
                                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                                  300 North LaSalle
                                                  Chicago, Illinois  60654
                                                  Telephone:     (312) 862-2000
                                                  Facsimile:     (312) 862-2200

                                                  *Counsel to the Foreign Representative*

## <u>VERIFICATION OF PETITION</u>

I, Luc Péligry, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative for the Debtor.  As such, I have full authority to verify the foregoing Petition on behalf of the Debtor.

I have read the foregoing Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 17, 2020

*/s/ Luc Péligry*
_____
By:  Luc Péligry
Chief Financial Officer
Europcar Mobility Group S.A.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| EUROPCAR MOBILITY GROUP S.A., | ) Case No. 20-12878 (___) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

### ORDER GRANTING PETITION FOR (I) RECOGNITION AS FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Upon consideration of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (together with the form petition filed concurrently therewith, the "Petition"),[1] filed by the Foreign Representative as the "foreign representative" of the above-captioned debtor (the "Debtor"); and upon the hearing on the Petition and this Court's review and consideration of the Petition, the Péligry Declaration, and the Kopf Declaration; IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

B.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

C.    Venue is proper before this Court pursuant to 28 U.S.C. § 1410.  This Court has the authority to enter a final order consistent with Article III of the United States Constitution.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

[2]    The findings and conclusions set forth herein and in the record of the hearing on the Petition constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

D.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the hearing on the Petition has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q), to: (a) the U.S. Trustee; (b) all persons authorized to administer the foreign proceeding of the Debtor; (c) all parties to litigation pending in the United States in which the Debtor is a party as of the Petition Date; (d) counsel to the Cross-Holders Coordinating Committee; and (e) such other entities as this Court may direct.

E.      No objections or other responses were filed that have not been overruled, withdrawn, or otherwise resolved.

F.      This chapter 15 case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

G.      The Foreign Representative is a "person" pursuant to section 101(41) of the Bankruptcy Code and is the duly appointed "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.  The Foreign Representative has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

H.      The French Proceeding and any orders issued by the French Court during the pendency of the French Proceeding are entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

I.      The French Proceeding is pending in the French Republic, where the Debtor has its "center of its main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code. Accordingly, the French Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code and is entitled to recognition as foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

J.      Cause exists to modify the automatic stay under section 362 of the Bankruptcy

Code solely to the extent requested in the Petition.

K.      The relief granted hereby is necessary to effectuate the purposes and objectives of

chapter 15 and to protect the Debtor and its interests.

BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION
AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The French Proceeding is recognized as a foreign main proceeding pursuant to

section 1517 of the Bankruptcy Code, and all the effects of recognition as set forth in section 1520

of the Bankruptcy Code shall apply, except as modified herein.

2.      Upon entry of this Order, the French Proceeding, the SFA Plan, and all orders of

the French Court shall be and hereby are granted comity and given full force and effect in the

United States and, pursuant to section 1520 of the Bankruptcy Code, among other things:

     a.      the protections of section 362 of the Bankruptcy Code apply to the Debtor,
except as otherwise modified by this Order;

     b.      all parties are hereby permanently enjoined from asserting any debt, claim,
or interest affected by the SFA Plan, except as expressly permitted by the
SFA Plan and the agreements and documents related to the SFA Plan,
including (i) executing against any of the Debtor's assets, (ii) commencing
or continuing, including issuing or employing process, of a judicial,
quasi-judicial, administrative, regulatory, arbitral, or other action or
proceeding, or to recover a claim, including, without limitation, any and all
unpaid judgments, settlements or otherwise against the Debtor, its property,
or any direct or indirect transferee of or successor to any property of the
Debtor, or any property of such transferee or successor, or the seeking of
any discovery related to any of the foregoing, which in each case is in any
way inconsistent with, relates to, or would interfere with, the administration
of the Debtor's estate in the French Proceeding, French law, or the
implementation or consummation of the SFA Plan; (iii) taking or continuing
any act to create, perfect, or enforce a lien or other security interest, setoff,
or other claim against the Debtor or any of its property or proceeds thereof,
which in each case is in any way inconsistent with, relates to, or would
interfere with, the administration of the Debtor's estates in the French
Proceeding, French law, or the implementation or consummation of the
SFA Plan; (iv) transferring, relinquishing or disposing of any property of
the Debtor to any entity other than the Foreign Representative and his

3

authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, which in each case is in any way inconsistent with, relates to, or would interfere with, the administration of the Debtor's estates in the French Proceeding, French law or the implementation or consummation of the SFA Plan; or (v) commencing or continuing in any manner, directly or indirectly, an individual action or proceeding concerning the Debtor's assets, rights, obligations, or liabilities, or to resolve any dispute arising out of any provision of the SFA Plan, French law relating to the SFA Plan, in each case, to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code;

c.    except to the extent permitted by the SFA Plan or the agreements entered into in connection therewith as the case may be, all persons and entities are enjoined from seizing, attaching, and enforcing or executing liens or judgments against the Debtor's property in the United States or from transferring, encumbering, or otherwise disposing of or interfering with the Debtor's assets or agreements in the United States without the express consent of the Foreign Representative; and

d.    except to the extent permitted by the SFA Plan or the agreements entered into in connection therewith as the case may be, all persons and entities are enjoined from commencing or continuing, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Debtor or its assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative, or other judgment, assessment, order, lien, or arbitration award against the Debtor or its assets or proceeds thereof.

3.    The Foreign Representative and the Debtor shall be entitled to the full protections and rights enumerated under section 1521(a)(4) and (5) of the Bankruptcy Code and, accordingly, the Foreign Representative:

a.    is entrusted with the administration or realization of all of the Debtor's assets and affairs in the United States; and

b.    has the right and power to examine witnesses, take evidence, or deliver information concerning the Debtor's assets, affairs, rights, obligations, or liabilities.

4.    The Foreign Representative is hereby established as the representative of the Debtor with full authority to administer the Debtor's assets and affairs in the United States, including,

without limitation, making payments on account of the Debtor's prepetition and postpetition obligations.

5.      The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or Local Rules of this Court.

6.      No action taken by the Foreign Representative, the Debtor, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the French Proceeding, this Order, this chapter 15 case, any adversary proceeding herein, or contested matters in connection herewith, will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including, without limitation, pursuant to section 1510 of the Bankruptcy Code.

7.      The automatic stay pursuant to section 362 of the Bankruptcy Code, solely to the extent applicable pursuant to section 1520 of the Bankruptcy Code and this Order, is modified to apply only to those matters stayed in the French Proceeding, including, without limitation:  the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtor that was or could have been commenced before the Petition Date, or to recover a claim against the Debtor held by a financial creditor that arose before the Petition Date; any act to create, perfect, or enforce against property of the Debtor any lien to the extent that such lien secures a claim against the Debtor held by a financial creditor; and any act to collect, assess, or recover a claim against the Debtor held by a financial creditor.

8.      The Foreign Representative and the Debtor are authorized to take any and all actions deemed necessary or appropriate to effectuate the SFA Plan and the Restructuring Transaction, in each case in accordance with their terms.

9.      Subject to the SFA Plan receiving the approval of the French Court, the SFA Plan is hereby recognized, granted comity, and given full force and effect in the United States and is binding and enforceable, in accordance with its terms, pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code, on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose claims or interests are affected by the SFA Plan.

10.     The banks and financial institutions with which the Debtor maintains bank accounts or on which checks are drawn or electronic payment requests made in payment of prepetition or postpetition obligations are authorized and directed to continue to service and administer the Debtor's bank accounts without interruption and in the ordinary course and to receive, process, honor, and pay any and all such checks, drafts, wires, and automatic clearing house transfers issued, whether before or after the petition date and drawn on the Debtor's bank accounts by respective holders and makers thereof and at the direction of the Foreign Representative or the Debtor, as the case may be.

11.     Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the SFA Plan, and nothing herein shall modify the right of the French Court to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the SFA Plan, or out of any action to be taken or omitted to be taken under the SFA Plan or in connection with the administration of the SFA Plan.

12.     The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

13.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6

14.     This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

15.     This Order applies to all parties in interest in this chapter 15 case and all of their agents, employees, and representatives, and all those who act in concert with them who receive notice of this Order.

New York, New York
Dated: _____, 2021

_____
UNITED STATES BANKRUPTCY JUDGE