David R. Seligman, P.C.
Susan D. Golden
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Christopher M. Hayes (*pro hac vice* pending)
Alexander D. McCammon (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| EUROPCAR MOBILITY GROUP S.A.,[1] | Case No. 20-12878 (___) |
| Debtor in a Foreign Proceeding. | |

### DECLARATION OF FOREIGN REPRESENTATIVE PURSUANT TO 11 U.S.C. § 1515 AND RULE 1007(a)(4) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IN SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

I, Luc Péligry, to the best of my information and belief, state as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration based upon my own personal knowledge except for those portions specified as being otherwise.  I am making this declaration in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1]    Europcar Mobility Group S.A. is the debtor in this chapter 15 case.  Europcar Mobility Group S.A. is a public limited company with registration number 489 099 903.  The location of Europcar Mobility Group S.A.'s registered office is 13 ter Boulevard Berthier, 75017 Paris, France.

2.      I serve as the chief financial officer for the above-captioned debtor, Europcar Mobility Group S.A. (the "Debtor"), in connection with the French Proceeding (as defined below). I have served in my current capacity at Europcar Mobility Group S.A. since January 2018.  I am the foreign representative (the "Foreign Representative") of the Debtor and authorized to commence this chapter 15 case.

3.      I submit this declaration in support of:  (a) the official form chapter 15 petition for the Debtor; and (b) the Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code (the "Verified Petition").

## Background

### I.      Europcar's Corporate History.

4.      The Debtor and its non-Debtor direct and indirect subsidiaries (collectively, the "Europcar Group") is an industry-leading mobility service company.  Founded in 1949 as "L'Abonnement Automobile," today the Europcar Group provides mobility services and solutions to over 9.5 million customers in more than 140 countries.  The Europcar Group offers attractive alternatives to vehicle ownership in a responsible and sustainable way.  With its innovative fleet and technologically-advanced infrastructure, the Europcar Group is well-positioned to continue to provide mobility solutions to millions of businesses and individual customers worldwide.

### II.      Europcar's Business Operations.

#### A.      Business Overview.

5.      The Debtor itself is a holding company and its principal assets consist of direct and indirect investments in its different subsidiaries that generate the Europcar Group's cash flow.  The Europcar Group provides various mobility-related services and solutions, including: car rental and light commercial vehicle rental, chauffeur services, car-sharing, scooter-sharing, and private hire

vehicle rental.  With a 70-year history of service to the public as well as local and international companies, the Europcar Group represents an alternative to public transportation and private vehicle ownership, whether through short-term rentals or car sharing.  The Europcar Group's corporate mission encompasses sustainability and "green" initiatives, and the Europcar Group has been awarded World Travel Awards for the World's Leading Green Transport Solution Company for five years running.  The Europcar Group is an integral part of the supply chain and operating models of many companies, particularly in the distribution and logistics sector.  The Europcar Group also provides services to the healthcare industry, the police, and central and local governments.

6.      For the year ended December 31, 2019, the Europcar Group reported €278 million of adjusted corporate EBITDA on €3.022 billion of revenue.  Historically, the Europcar Group's airport-located stations represented almost half its annual revenue, despite representing only about 17% of its total stations (by number).  The ongoing deleterious impact of the COVID-19 pandemic on air travel has significantly constrained revenue at the Europcar Group's airport stations and, thus, overall.

7.      The Europcar Group operates mainly in Europe through its directly operated and agent-operated stations.  It is also present internationally through its franchises as well as via partnerships and general sales agency agreements.  The Europcar Group's directly- and agent-operated stations are located in countries in which the Europcar Group has a longstanding local presence and expertise, while franchise stations extend the Europcar Group's network around the world, bringing the Europcar Group's range of services to a wider customer base and increasing the reputation of its brands worldwide.

### B.    Core Brands Overview.

8.      The Europcar Group's brand portfolio demonstrates a strong capability to meet the mobility needs in all market segments with innovative mobility solutions.  The Europcar Group has four core brands that meet the mobility needs of its broad customer base:  Europcar, Goldcar, InterRent, and Ubeeqo.  The Europcar Group covers the traditional and upscale market with its Europcar brand, the mid-range market with its InterRent brand, the low-cost market with its Goldcar brand, and the urban mobility market with its Ubeeqo brand.  These four core brands serve a 27% share of the European market, making the Europcar Group the undisputed car rental leader in Europe.  In 2019, the Europcar brand also expanded into the United States, Finland, and Norway, in both the leisure and business markets.

### C.    Europcar.

9.      The Europcar brand is the Europcar Group's core brand, addressing the mainstream short- to long-term vehicle, car, van, and truck rental market.  The Europcar brand provides its customer base an extensive choice of user experiences, including a fully digitized journey or a step-by-step journey with human interaction at all stages.  The Europcar brand serves a wide range of market segments, as well as a portfolio of diversified customers, from large multinational business accounts to small and medium enterprises and individual customers.

### D.    InterRent.

10.     InterRent, originally a low-cost brand, has repositioned itself as the Europcar Group's mid-tier market brand following the acquisition of Goldcar.  As a consequence of its "Key N Go" system, InterRent provides a smooth service that directly connects the customer, his or her smartphone, and the car to allow customers to pick up the keys to the rental car without visiting the InterRent counter.  InterRent operates in a leisure-focused market.

E.    **Goldcar.**

11.    Goldcar is the Europcar Group's low-cost brand.  Goldcar enables its customers to receive the best value for their vacation budget by choosing a more economical vehicle rental option.  In addition to the "Key N Go" system, Goldcar leverages more than one hundred stations in Europe and a presence in more than twenty airports in the United States to provide low-cost mobility services worldwide.

F.    **Ubeeqo.**

12.    Ubeeqo is a French start-up company established in 2008.  Since February 2017, the Debtor wholly owns Ubeeqo International.  This acquisition was part of the Europcar Group's strategy to expand its mobility solutions offerings to respond to customer needs by providing simple, turnkey solutions.  Ubeeqo is one of the European leaders of round-trip car-sharing, serving both businesses and individual consumers in primarily urban regions.

III.    **Europcar's Prepetition Corporate and Capital Structure.**

13.    The Debtor is a *société anonyme* organized under the laws of France, and its common shares are publicly traded and listed on the Euronext Paris Exchange.  As of December 31, 2019, the Debtor's share capital was divided into 163,884,278 ordinary shares with a par value of €1 each.  As of December 31, 2019, a significant portion of the Debtor's shares and exercisable voting rights were held by Eurazeo SE (29.89% and 31.51%, respectively).  A simplified chart depicting Europcar's organizational structure is attached hereto as **Exhibit A**.

14.    As of the Petition Date, the Debtor is borrower or issuer on a principal amount of prepetition funded indebtedness totaling approximately €2.12 billion of Euro-denominated debt, comprising the main debt instruments as described in the following sections, and has guaranteed

certain obligations of certain of its subsidiaries, including approximately $236.6 million of U.S. dollar-denominated obligations of U.S. subsidiary Fox Rent-a-Car.[2]

### A.    2024 Senior Notes.

15.    On November 2, 2017, the Debtor's subsidiary, Europcar Drive D.A.C. ("Europcar Drive") issued Senior Notes in the amount of €600 million due November 15, 2024 and paying 4.125% annual interest ("2024 Senior Notes"), under the terms of an indenture between Europcar Drive as issuer, and The Bank of New York Mellon, London Branch as trustee (the "Notes Trustee"), transfer and principal paying agent, and security agent, and The Bank of New York Mellon S.A./N.V., Luxembourg Branch as Luxembourg depositary and paying agent, as amended pursuant to a supplemental indenture dated October 13, 2020, and as further amended pursuant to a supplemental indenture dated December 7, 2020, and as further amended from time to time.  The 2024 Senior Subordinated Notes were listed for trading on the Euro MTF Market of the Luxembourg stock exchange.  On December 19, 2017, the Debtor assumed all the obligations of Europcar Drive as issuer of the 2024 Senior Notes.

### B.    2026 Senior Notes.

16.    On April 24, 2019, the Debtor's subsidiary, Europcar Mobility Drive D.A.C. ("Europcar Mobility Drive"), issued senior notes in the amount of €450 million due April 30, 2026 and paying 4.000% annual interest ("2026 Senior Notes, and together with the 2024 Senior Notes, the "Senior Notes"), under the terms of an indenture between Europcar Mobility Drive as issuer, and the Notes Trustee as trustee, transfer and principal paying agent, and security agent for the 2026 Senior Subordinated Notes, and The Bank of New York Mellon S.A./N.V., Luxembourg Branch as Luxembourg depositary and paying agent, as amended pursuant to a supplemental

---

[2]    The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

indenture dated October 13, 2020, and as further amended pursuant to a supplemental indenture

dated December 7, 2020, and as amended from time to time.  The 2026 Senior Notes were listed

for trading on the Euro MTF Market of the Luxembourg stock exchange.  On June 15, 2019, the

Debtor assumed all the obligations of Europcar Mobility Drive as issuer of the 2026 Senior Notes,

and gross proceeds from the issuance of 2026 Senior Notes were assigned to the Debtor.

C.     **Fleet Notes.**

17.    On November 2, 2017, EC Finance Plc ("ECF"), an "orphan SPV" established for

the purpose of issuing the Fleet Notes (as defined below), issued 2.375% senior secured notes for

a principal amount of €350 million due in 2022 (the "Fleet Notes, and together with the Senior

Notes, the "Notes") pursuant to an indenture between, *inter alia*, ECF, as issuer, the Debtor as

guarantor, The Bank of New York Mellon, London Branch as trustee, transfer and principal paying

agent and security agent, and The Bank of New York Mellon SA/NV, Luxembourg Branch as

depositary and Luxembourg transfer and paying agent, as amended pursuant to a supplemental

indenture dated October 13, 2020, and as further amended pursuant to a supplemental indenture

dated December 7, 2020, and as amended from time to time.  The Fleet Notes are admitted to

trading on the Euro MTF market of the Luxembourg Stock Exchange.  On June 29, 2018, ECF

issued new senior notes bearing interest at a rate of 2.375% for a total amount of €150 million due

2022, also guaranteed by the Debtor.  As a result of this second issuance, €500 million in aggregate

principal amount of Fleet Notes are outstanding as of the date hereof.

D.     **Revolving Credit Facility.**

18.    On July 13, 2017, the Debtor entered into a €500 million senior revolving credit

facility (the "RCF"), pursuant to a revolving credit facility agreement (as amended from time to

time, the "RCF Agreement") between, *inter alia*, the Debtor and several of its subsidiaries[3] as borrowers, Bank of America Merrill Lynch International Limited and others[4] as bookrunners, several banks[5] as mandated lead arrangers and lenders, and Crédit Agricole Corporate and Investment Bank as agent and security agent. The RCF Agreement contains a cross-default provision providing that any payment default of the Debtor or its subsidiaries under the Notes constitutes a default under the RCF Agreement. The RCF Agreement was amended on May 29, 2019, in order to, among other things, increase the total committed amount by €150 million, bringing the total maximum amount to €650 million. In May 2020, a new additional tranche of €20,000,000 has been added to the RCF as an "incremental facility," bringing the total maximum amount to €670 million. The RCF will mature in June 2023.

### E.    CS Facility.

19.    On December 27, 2019 the Debtor entered into a €50 million unsecured term loan (the "CS Facility") pursuant to that certain term loan facility agreement, dated as of December 27, 2019, between the Debtor, as borrower, and Crédit Suisse International, as original lender, agent, and calculation agent. The CS Facility matured on December 6, 2020.

### F.    The Fox Rent-a-Car Guarantees.

20.    The Debtor has guaranteed certain U.S. dollar-denominated obligations of its U.S. subsidiary, Fox Rent-a-Car (the "Fox Rent-a-Car Guarantees"), in connection with Fox

---

[3]    These subsidiaries include Europcar International S.A., Europcar Holding S.A.S, Europcar Autovermietung GmbH, Europcar France S.A.S., Europcar International S.A.S.U. & Co OHG, and Europcar IB, S.A.U.

[4]    Additional bookrunners include BNP Paribas, Crédit Agricole Corporate and Investment Bank, Deutsche Bank AG, London Branch, HSBC France, Natixis, and Société Générale Corporate and Investment Banking.

[5]    These banks include Banco Bilbao Vizcaya Argentaria S.A., Paris Branch, Bank of America Merrill Lynch International Limited, BNP Paribas, Crédit Agricole Corporate and Investment Bank, Crédit Industriel et Commercial, Deutsche Bank AG, London Branch, Goldman Sachs International, HSBC France, ING Bank N.V., French Branch, KBC Bank N.V., French Branch, Lloyds Bank plc, Natixis, and Société Générale Corporate and Investment Banking and National Westminster Bank plc (formerly known as The Royal Bank of Scotland plc).

Rent-a-Car's business operations within the United States.  Half of the Fox Rent-a-Car Guarantees are governed by the laws of the state of New York and contain New York forum selection clause; others are governed by the laws of the states of Massachusetts, Minnesota, and New Jersey, as applicable.

IV.    **Events Leading to the Chapter 15 Case and the *Sauvegarde Financière Accélérée* (or "Expedited Financial Safeguard") Proceeding.**

A.    **Capital and Liquidity Constraints.**

21.    In November 2019, the Debtor finalized its acquisition of Fox Rent-a-Car, giving the Europcar Group a direct presence in the United States, the largest economy in the world. Despite the Debtor's recent growth, the COVID-19 pandemic, among other factors, has materially disrupted the travel and mobility service industries, significantly depressing the Debtor's revenue from vehicle rentals.  Over the course of the last year, the Debtor faced further challenges due to the downgrading of its debt by the major ratings agencies.

22.    Since the start of March 2020, the international spread of the COVID-19 pandemic forced a large number of governments to put in place exceptional travel restrictions or lockdowns and to limit or prohibit public meetings or gatherings.  The Debtor took appropriate measures with regard to its employees, customers, and business, with a dedicated multidisciplinary team working under the supervision of the Debtor's management board.

23.    On March 23, 2020, the Debtor announced that, in response to an exceptional situation and to the resulting loss of income, it had launched an unprecedented cost reduction and cash protection plan to weather the pandemic and resume its activities as soon as local economies regained momentum.  As part of this cost reduction and cash protection plan, certain of the Debtor's subsidiaries in France and Spain obtained financing guaranteed by the French and Spanish national governments, respectively.

24.     In addition to these measures, the Debtor took steps to proactively address its balance sheet challenges by engaging with its stakeholders prior to the Petition Date. Notwithstanding these efforts, external factors continued to limit the Debtor's financial performance, growth opportunities, and liquidity.  When coupled with the Debtor's capital structure and upcoming debt maturities, it became apparent that a more comprehensive restructuring transaction was necessary to right-size the Debtor's balance sheet.

**B.     Restructuring Negotiations with Stakeholders.**

25.     On November 26, 2020, following several weeks of extensive negotiations, the Debtor announced having entered into a lock-up agreement with the members of the coordinating committee representing the group of holders of each series of 2024 Senior Notes, 2026 Senior Notes, and Fleet Notes also holding interests in the RCF and the CS Facility (representing approximately 51.1% of the 2024 Senior Notes, approximately 72.7% of the 2026 Senior Notes, 100% of the CS Facility, approximately 45.7% of the RCF commitments, and approximately 22.2% of the Fleet Notes) (the "Cross-Holders Coordinating Committee").  On December 7, 2020, the Debtor announced several amendments to the lock-up agreement, including, *inter alia*, extending the subscription period with respect to €480 million in new-money financing and the RCF refinancing and expanding the opportunity to participate in the backstop arrangement underpinning the Restructuring Transaction (as defined herein) to all holders of the 2024 and 2026 Senior Notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee during the dedicated backstop commitment period, which has been opened to that effect and will expire on December 18, 2020, under which the underwriting of €1.145 billion of New Money and RCF refinancing will be guaranteed.

26.     Pursuant to this lock-up agreement, the members of the Cross-Holders Coordinating Committee committed to support and to take all steps and actions reasonably

necessary to implement and consummate the financial restructuring as described in the press release published by the Debtor on November 26, 2020.

27.     On December 14, 2020, the Debtor commenced the French Proceeding pursuant to Articles L. 628-1 *et seq.* of the French Commercial Code.  The ultimate goal of the French Proceeding is to restructure the obligations owed by the Debtor to its creditors by implementing the financial restructuring described in the lock-up agreement (the "Restructuring Transaction") through an expedited financial safeguard plan (the "SFA Plan").  The Debtor and its advisors have worked closely with their key stakeholders to negotiate and implement a holistic restructuring. The results of this process are reflected in the SFA Plan.

### C.     The Debtor's SFA Plan.

28.     Following issuance of the Opening Judgment on December 14, 2020, the Debtor expects to distribute the SFA Plan to financial creditors entitled to vote thereon. The vote of the affected creditors to approve or reject the SFA Plan will be convened on or around January 7, 2021.

29.     The framework of the SFA Plan contemplates a comprehensive deleveraging of Europcar's balance sheet through a combination of:

    a.     €480 million in new-money financing (the "New Money"), made available to the Debtor and its affiliates, as follows:

        i.     €225 million new revolving fleet financing (the "Fleet Financing New Money") made available to the Europcar Group by subscribing holders of the Senior Notes, maturing December 2024, fully backstopped in cash by the members of the Cross-Holders Coordinating Committee and other holders of the Senior Notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee;

        ii.     €255 million of New Money in equity through:

            (a)     a rights issue of €50 million with preferential subscription rights for the benefit of existing shareholders by issuance of

new shares, fully backstopped in cash by the members of the Cross-Holders Coordinating Committee and other holders of the Senior Notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee;

(b)    a share capital increase of €200 million reserved to the holders of the Senior Notes by issuance of new shares, fully backstopped in cash by the members of the Cross-Holders Coordinating Committee and other holders of the Senior Notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee (the "<u>Senior Noteholders Capital Increase</u>");

(c)    a share capital increase of €5 million following the exercise of Penny Warrants (as defined below);

b.    full equitization of:

i.    the principal amount (plus accrued and unpaid interest, including the coupon due on November 16, 2020 and which will not be paid at the end of the 30-day grace period) of the 2024 Senior Notes;

ii.    the principal amount (plus accrued and unpaid interest, including the coupon due on October 30, 2020 and which will not be paid at the end of the 30-day grace period) of the 2026 Senior Notes;

iii.    the principal amount (plus accrued and unpaid interest) of the CS Facility.

c.    Refinancing of the RCF (the "<u>RCF Refinancing</u>"):

i.    refinancing of the €670 million RCF through the granting to the Debtor and other relevant non-Debtor subsidiary entities of a €170 million revolving credit facility (opened to all the holders of Senior Notes with an oversubscription option) and a €500 million term loan facility (opened in priority to all lenders under the RCF, and then to all holders of Senior Notes if any remaining amount, each time with an oversubscription option), maturing June 2023, fully backstopped in cash by the members of the Cross-Holders Coordinating Committee and other holders of Senior Notes who commit to backstop on the same terms and conditions as those applicable to the Cross-Holders Coordinating Committee;

d.    Allocation of penny warrants (the "<u>Penny Warrants</u>"):

        i.     The issuance of Penny Warrants to the members of the Cross-Holders Coordinating Committee, the lenders under the RCF, and holders of Senior Notes, as a result of their coordination efforts, their subscription undertakings, and their backstop arrangements, as applicable, consistent with the terms of the definitive documents for the Restructuring Transaction.

30.     Assuming the requisite approvals of the creditors are obtained, the Debtor will seek approval of the SFA Plan at an extraordinary general meeting of its shareholders. Such approval is required to modify the Debtor's bylaws in order to implement certain equitization transactions contemplated by the SFA Plan. As a French listed company, the threshold for a quorum at the extraordinary general meeting is 25% of the shareholders on the first convening notice and 20% on the second. The voting shareholders must approve the SFA Plan by a two-thirds majority for it to become effective.[6] Under the SFA Plan, existing shareholders will retain their equity interests, subject to dilution on account of the equity rights offering and equitization of the Senior Notes and CS Facility plus accrued interest.

31.     This comprehensive restructuring will be effected over the course of the next few months. The Debtor expects to submit a final form of the SFA Plan to a vote of affected creditors on or around January 7, 2021. The Debtor also expects to submit certain terms of the SFA Plan to a vote of its shareholders at a general meeting on or around January 20, 2021. In the event that the Debtor's shareholders vote in favor of the SFA Plan, the French Court will hold a hearing to consider approval of the SFA Plan and the transactions contemplated thereby, likely before the end of January 2021. If the French Court is satisfied that the SFA Plan meets the applicable requirements of French law, the SFA Plan will be approved and the Debtor and its stakeholders will proceed with consummation thereof, including the infusion of additional new money financing

---

[6]    By exception, the French Court may hold that the SFA Plan may be approved by a simple 50% majority on the first convening notice if a quorum representing at least 50% of shareholders is reached.

and the equitization of up to approximately €1,100 million in principal amount of the Senior Notes and CS Facility.

32.     In the event that the Debtor's shareholders vote against at least one of the resolutions under the SFA Plan, the SFA Plan cannot be approved by the French Court. Consequently, the Debtor would petition the French Court to terminate the French Proceeding and file for *redressement judiciaire* (rehabilitation proceedings) or *liquidation judiciaire* (liquidation proceedings).

**V.     Appointment as Foreign Representative and Filing of the Verified Petition.**

33.     On December 8, 2020, the Debtor's supervisory board (the "Board") authorized the management board to launch the Chapter 15 proceedings, and I have been consequently appointed as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code for purposes of the French Proceeding.  Concurrently, I have been authorized to file the Verified Petition for recognition of the French Proceeding as a foreign main proceeding or, in the alternative, as a foreign nonmain proceeding under chapter 15 of the Bankruptcy Code.  In addition, at the opening hearing in the French Proceeding held on December 14, 2020, the French Court acknowledged that I would act as the "foreign representative" of the Debtor in any ancillary recognition proceedings with respect to the French Proceeding.

34.     It is my understanding that for these reasons, I satisfy the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

35.     The Debtor's principal assets in the United States are located in New York, New York.  Specifically, the Notes and certain of the Fox Rent-a-Car Guarantees are each governed by New York state law and contain a New York forum selection clause.

36.     I filed the Verified Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this chapter 15 case in the United States Bankruptcy Court for the Southern

District of New York, seeking recognition of the French Proceeding as a "foreign main proceeding," or, in the alternative, as a "foreign nonmain proceeding," and seeking other necessary or appropriate relief in support of the French Proceeding.  I have been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "the center of its main interests" ("COMI").  I have also been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign nonmain proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "an establishment."

37.    I have also been informed that the French Proceeding is a "foreign proceeding" as it is a collective judicial proceeding authorized and supervised by the French Court under the French Commercial Code.  It is my understanding that, for these reasons, the French Proceeding qualifies as a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code.

38.    In addition, I believe that the Debtor has its COMI in France.  The Debtor is organized under French law and its registered office and corporate headquarters are located at 13 ter Boulevard Berthier, 75017 Paris, France.  In addition:  the Debtor is primarily controlled by, and decision-making is made from, its headquarters in Paris, France; the Debtor is a publicly-traded company listed on the Euronext Paris Exchange; major components of the Debtor's workforce, assets, and operations are located in France; and a material portion of the Debtor's administrative functions, including accounting, financial reporting, budgeting, and cash management, are conducted in France.

39.    Based on these facts, I believe that recognition of the French Proceeding as a foreign main proceeding is warranted.  I also believe recognition of myself as the Debtor's "foreign representative" and recognition of the French Proceeding—whether as a "foreign main proceeding" or, in the alternative, a "foreign nonmain proceeding"—will allow the Debtor to restructure in the most efficient manner without jeopardizing creditors' rights.

40.    For the reasons set forth in the Verified Petition, I submit that recognition of the French Proceeding is necessary and appropriate for the benefit of the Debtor, its creditors, and other parties in interest.

**VI.    Statement Pursuant to Section 1515 of the Bankruptcy Code.**

41.    I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)    A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b)    A petition for recognition shall be accompanied by—

(1)    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2)    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3)    in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

42.    In satisfaction of section 1515(b) of the Bankruptcy Code, I submit this declaration describing the existence of the French Proceeding and my authorizing therein to act as the Foreign Representative of the Debtor.  In addition, I understand that the French Proceeding is a "foreign

proceeding" as such term is defined in section 101(23) of the Bankruptcy Code, and there are no

other foreign proceedings pending against the Debtor.  Therefore, the Verified Petition meets the

requirements of section 1515 of the Bankruptcy Code in satisfaction of the third requirement under

section 1517(a) of the Bankruptcy Code.

## VII.    Disclosure Pursuant to Bankruptcy Rule 1007(a)(4).

43.    I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

> In addition to the documents required under § 1515 of the Code, a foreign
> representative filing a petition for recognition under chapter 15 shall file with the
> petition:  (A) a corporate ownership statement containing the information described
> in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the
> names and addresses of all persons or bodies authorized to administer foreign
> proceedings of the debtor, all parties to litigation pending in the United States in
> which the debtor is a party at the time of the filing of the petition, and all entities
> against whom provisional relief is being sought under § 1519 of the Code.

44.    I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that

a corporate ownership statement:

> . . . identif[y] any corporation, other than a governmental unit, that directly or
> indirectly owns 10% or more of any class of the corporation's equity interests, or
> states that there are no entities to report under this subdivision.

## A.    Corporate Ownership Statement.

45.    In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the

following is a corporate ownership statement of the Debtor, which identifies any corporation (other

than a governmental unit) that directly or indirectly owns 10 percent or more of any class of the

Debtor's equity interests:

- As of December 31, 2019, Eurazeo SE owned or controlled, as applicable,
  29.89% of the Debtor's share capital, 29.79% of the theoretical voting rights of
  the Debtor, and 31.51% of the exercisable voting rights of the Debtor.

B.      **List of Administrators.**

46.     In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtor, the Board, and the Foreign Representative shall maintain control of and be authorized to administer the French Proceeding.  The service address for the Debtor in this chapter 15 case is 13 ter Boulevard Berthier, 75017 Paris, France.

47.     Mr. Alain Fargeaud is the *juge-commissaire* appointed in the French Proceeding, located at:  Commercial Court of Paris, 1 Quai de la Corse, 75004 Paris, France.

48.     SELARL FHB, acting through Maître Hélène Bourbouloux, is the *administrateur judiciaire* appointed in the French Proceeding, located at:  176 avenue Charles de Gaulle, 92000 Neuilly-sur-Seine.

49.     SELAFA MJA, acting through Maître Lucile Jouve, is the *mandataire judiciaire* appointed in the French Proceeding, located at:  102 rue du Faubourg Saint-Denis, 75010 Paris, France.

50.     I am not aware of any other persons or bodies authorized to administer the French Proceeding on behalf of the Debtor.

C.      **Parties to Litigation Pending in the United States.**

51.     Counsel has informed me that the Bankruptcy Rule 1007(a)(4) requires the foreign representative to file a list containing the names and addresses of all parties to litigation pending in the United States at the time of the commencement of a chapter 15 case.  The Debtor is not party to any litigation pending in the United States as of the date hereof.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 17th day of December, 2020.

*/s/ Luc Péligry*
Luc Péligry
Foreign Representative

## <u>EXHIBIT A</u>

**Europcar's Corporate Structure (Simplified)**

**Europcar Mobility Group S.A. Corporate Structure**



**<u>EXHIBIT B</u>**

**Board Minutes**

| | |
|---|---|
| **Europcar Mobility Group**<br>A public limited company (*société anonyme*) with a Management Board and Supervisory Board and share capital of €163,884,278<br>Registered office: 13 ter, boulevard Berthier<br>75017 Paris, France<br>Paris Trade and Companies Register No. 489 099 903<br>("**the Company**") | **Extract of the Minutes**<br><br>of the meeting of the<br><br>**Supervisory Board**<br><br>of<br><br>**December 8, 2020** |

On December 8, 2020 at 7:00 p.m

The members of the Company's Supervisory Board met at the Group HQ and via secured-access conference.

The following participated in the conference call:

- Mr Jean-Paul Bailly
- Mr Pascal Bazin
- Mr Antonin Marcus
- Ms Virginie Fauvel
- Ms Martine Gerow
- Mr Sandford Miller
- Ms Sophie Flak
- Mr Alessandro Ricciotti (representative of the employees)
- Ms Petra Friedmann

Persons not in attendance (apologies sent):

- Mr Philippe Audouin
- Mr Patrick Sayer
- Ms Adèle Mofiro-Mata (representative of the employees)

The following also participated in the conference call:

- Ms. Caroline Parot, Chairwoman of the Management Board,
- Mr. Fabrizio Ruggiero, Deputy CEO, Head of Business Units, member of the Management Board,
- Mr. Olivier Baldassari, Group Chief Countries and Operations Officer, member of the Management Board,
- Mr. Franck Rohard, Secretary General & Group General Counsel, Secretary of the Supervisory Board,
- Mr. Luc Péligry, Group Chief Finance Officer,
- Mr Arnaud Joubert, Rothschild & Co,
- Mr. Laurent Gautier, Darrois Villey Maillot Brochier,
- Mr Henry Barrault, Rothschild & Co,
- Mr. Camille Pochat, Rothschild & Co,
- Ms Catherine Ambos, Darrois Villey Maillot Brochier,
- Mr. François Kopf, Darrois Villey Maillot Brochier,
- Mr Nassim Ghalimi, Veil Jourde,
- Mr. Paul Lafuste, Veil Jourde,

The Meeting was opened under the chairmanship of Mr. Jean-Paul Bailly.

Mr. Franck Rohard was appointed to serve as secretary.

8920239.2



As the quorum requirements were met, the Supervisory Board discussed, reviewed, and checked the following items:

- Update on ESTE process

- SFA vote

- Budget vs BP / IBT scenario and Next steps

- Misceleanous


\*\*\*

(...)

## 2.        Este Process

(...)

2.1        Authorization of opening an accelerated financial safeguard (*sauvegarde financière accélérée*)

On November 25, 2020, the Company has entered into a lock-up agreement with the members of the coordinating committee representing the group of holders of each series of 2024 Senior Notes, 2026 Senior Notes and of the EC Finance plc's Senior Secured Notes, also holding interests in the RCF and the Credit Suisse Facility, in order to implement and consummate the agreed restructuring proposal. On December 6, 2020, a technical amendment to the lock-up agreement has been executed by the Company and the other parties; this amendment having no impact with respect to the Company on the terms and conditions of the agreed restructuring proposal, as described in the supervisory meeting of November 25, 2020.

It is recalled to the Supervisory Board that the opening of an accelerated financial safeguard (*sauvegarde financière accélérée*) by the Commercial Court of Paris is a key prerequisite to the implementation and the consummation of the agreed restructuring proposal under the lock-up agreement, as such agreed restructuring proposal will need to be approved by the Commercial Court of Paris as part of the accelerated financial safeguard plan.

In this context, after discussions, the Supervisory Board:

(i)        unanimously approves the filing of a request to open an accelerated financial safeguard (*sauvegarde financière accélérée*) at the level of the Company (including for the avoidance of doubt any proceedings related to a Chapter 15 recognition of *the sauvegarde financière accélérée* in the United States),

(ii)        unanimously authorizes the Chairman of the Management Board to prepare, amend, finalize, sign and file all documents required to file the request to open an accelerated financial safeguard (*sauvegarde financière accélérée*) at the level of the Company (including for the avoidance of doubt any proceedings related to a Chapter 15 recognition of *the sauvegarde financière accélérée* in the United States).



**(…)**

\*\*\*

There being no further business to discuss, the meeting then terminated at 8:00 pm.

**TRUE CERTIFIED COPY**

_____

**Mr. Franck Rohard**
Secretary General & Group General Counsel,
Secretary of the Supervisory Board,